Dennis Stewart (SBN 99152)
**GUSTAFSON GLUEK PLLC**
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

***Counsel for Plaintiff and the Proposed Class***
*Additional Plaintiff's Counsel Appear*
*on the Signature Page*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| BRENT JACKSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALTRIA GROUP, INC. and JUUL LABS, INC.,<br><br>Defendants. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Brent Jackson on behalf of himself and all others similarly situated, by and through their undersigned attorneys, alleges as follows. All allegations herein, other than those relating directly to Plaintiff, are based on information and belief.

## INTRODUCTION

1.     This action arises out of an overarching, continuous conspiracy by Defendants Altria Group, Inc. ("Altria") and Juul Labs, Inc. ("Juul") (collectively "Defendants") to fix, raise, maintain, and/or stabilize prices for electronic cigarettes ("e-cigarettes") and electronic cigarette

products within the United States, its territories, and the District of Columbia during the period from, and including, at least December 7, 2018 through such time as the anticompetitive effects of Defendants' conduct ceases (the "Class Period"), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 7 of the Clayton Act, 15 U.S.C. § 18. Specifically, Altria agreed to refrain from competing with Juul and exit the closed-system e-cigarettes market in the United States in exchange for a 35% ownership interest in Juul.

2.     E-cigarettes were designed as an alternative to traditional smoking. Unlike traditional smoking, which involves heat-drying tobacco leaves, e-cigarettes are electronic devices that deliver nicotine to the user by vaporizing a liquid nicotine solution. Closed-system e-cigarettes deliver the liquid nicotine in pre-filled, sealed cartridges or pods. This alternative to traditional smoking quickly gained traction, increasing from seven million users in 2011 to 41 million users in 2018. During this same period, traditional smoking steadily declined.

3.     It was essential that Altria, the leading seller of traditional cigarettes, such as Marlboro, develop a product in the closed-system e-cigarette market in light of declining sales of traditional cigarettes. In August 2013, Altria, through its subsidiary Nu Mark, launched the MarkTen e-cigarette. Altria invested substantial resources and funds to develop and market the MarkTen e-cigarette and leveraged its position in the traditional smoking market to obtain highly coveted shelf space in retailers across the United States. Altria's efforts were successful, as the MarkTen became the second most popular closed-system e-cigarette brand by market share.

4.     Juul entered the market in 2015  and quickly became a leading seller of e-cigarettes. In 2016, Juul's sales increased 700% and by 2017, Juul had captured one third of the closed-system e-cigarette market. Juul's success posed a competitive threat to Altria in both the e-cigarette and traditional cigarette markets.

CLASS ACTION COMPLAINT

5.     Altria made several attempts to acquire or eliminate Juul. For years Altria and Juul aggressively competed with one another, often monitoring each other's e-cigarette prices, and competing against one another for the newest innovations. Altria, aware of Juul's success, released a pod-based product similar to Juul's product called the MarkTen Elite.

6.     By 2018 Juul had obtained 75% of the closed-system e-cigarette market. In the Summer of 2018, Altria began to pursue negotiations with Juul. Initially, Juul demanded that Altria exit the closed-system e-cigarette market and refused to negotiate until Altria removed its products from the shelves. After several months, Altria ultimately agreed to Juul's request. In December 2018, Altria discontinued all sales of its e-cigarette products and announced its intent to cease competing in the market.

7.     On December 20, 2018, Altria and Juul announced that they had executed several agreements, including a Purchase Agreement. Pursuant to the agreement, Altria purchased a 35% non-voting stake in Juul, which could be converted to a voting stake conditioned upon receiving Hart-Scott Rodino ("HSR") approval. In addition, Juul and Altria executed: (1) a Relationship Agreement, containing a non-compete provision prohibiting Altria from competing in the relevant market; (2) a Service Agreement, under which Altria agreed to provide support services to Juul; (3) an Intellectual Property License Agreement, licensing Altria's e-cigarette intellectual property to Juul; and (4) a Voting Agreement, which provided Altria with representation on Juul's Board of Directors ("Board"). Upon HSR approval, Altria was also granted the right to appoint one of its executives to a non-voting observer position on Juul's Board.

8.     Altria's exit from the e-cigarette market eliminated its existing products from the market and, through the Non-Compete Agreement, halted ongoing innovation towards developing a new and improved line of products. Thus, customers lost the benefit of competition between Altria and Juul, and Altria and other competitors.

9.      The agreement eliminated Altria from the relevant market and any threat to Juul's market dominance. The agreement further ensured Juul's controlling share in the market, as Altria had promised to provide Juul with resources, including its line of distribution and shelf space at retailers across the United States.

10.     After eliminating its competition from Altria, Juul was able to increase its dominant position in the market and charge supracompetitive prices for its products. Altria, in exchange for removing itself from the market, shared in these ill-gotten profits as a result of their agreement.

11.     No additional market participants could offset the anticompetitive effects of the agreement. First, for existing manufacturers to develop and market a competing product would require extensive time and capital funds. Second, new market participants face high entry barriers, including those set by the U.S. Food and Drug Administration ("FDA") which require a complex, lengthy, and expensive regulatory process before a new product can receive approval.

12.     Defendants have conspired to raise, fix, stabilize or maintain prices,  and restrict capacity within the market for the sale of e-cigarette products during the Class Period.

13.     Defendants' conduct has illegally restrained competition in the relevant market in violation of federal antitrust laws. As a direct and proximate result of Defendants' anticompetitive conduct, consumers and entities that purchased Juul products were overcharged and denied the benefits of innovation from a competitive market.

## PARTIES

**A.  Plaintiff**

14.     Plaintiff Brent Jackson is a resident of the State of Illinois. Mr. Jackson purchased Juul products directly from Juul through the Juul.com website during the Class Period.

**B. Defendants**

15.     Defendant Juul Labs, Inc. ("Juul"), is a Delaware corporation with its principal place of business located at 560 20th Street, San Francisco, California.

16.     Defendant Altria Group, Inc. ("Altria") is a Virginia corporation headquartered at 6601 West Broad Street, Richmond, Virginia 23230.

## JURISDICTION AND VENUE

17.     Plaintiff brings this action on its own behalf as well as that of the Class to recover damages, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and Section 7 of the Clayton Act, as well as any and all equitable relief afforded them under the federal laws pleaded herein.

18.     Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## INTRADISTRICT ASSIGNMENT

19.     Pursuant to Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants'

violations of the antitrust laws was substantially conducted with, directed to, or impacted Plaintiff and members of the Class in counties located within the Division. Furthermore, Juul's principal place of business is located within this Division.

## **FACTUAL ALLEGATIONS**

### **A. Overview of the Cigarette Industry and E-Cigarette Products**

20.    The determination of the harmful effects of tobacco use in the 1900's and early 2000's changed American society. The prohibition on smoking, social stigma, and increased taxes disincentivized Americans from smoking. In response, tobacco companies have searched for new ways to profit off of nicotine addiction.

21.    The first modern electronic cigarettes appeared in the U.S. market by the mid-2000s. E-cigarettes are electronic devices that deliver nicotine to a user by vaporizing a liquid nicotine solution. In a closed system, the liquid is contained in a pre-filled, sealed cartridge or pod. Around 2010, traditional tobacco companies started either entering the market with their own products or acquiring existing e-cigarette companies. Juul was and is the dominant player in the sale of closed-system e-cigarette products in the United States.

22.    E-cigarettes are sold directly to convenience stores, vape shops, and retail outlets. E-cigarettes products are largely sold directly to wholesale distributors, who, in turn, re-sell to convenience stores, vape shops, and retail outlets. Juul also sells its products directly to consumers through its website.

### **B. Defendants' Participation in the E-Cigarette Industry**

23.    In light of declining sales for traditional cigarettes and a shift by consumers to alternative nicotine delivery devices, Altria's participation in the e-cigarette market was essential to its long-term survival. Altria entered the e-cigarette market with its MarkTen e-cigarette

through its subsidiary Nu Mark LLC in 2013. Over the next several years, Altria spent over $100 million acquiring other existing e-cigarette platforms to augment its portfolio.

24.     In 2015, Pax Labs ("Pax") launched the JUUL e-cigarette, a closed-system in a discreet "pod-based" format. The device deployed a chemical breakthrough in the speed of its nicotine delivery. Pax discovered that by adding benzoic acid to nicotine salts, which occur naturally in tobacco, they could mimic a cigarette's rapid nicotine delivery.

25.     JUUL uses a proprietary blend of nicotine which contains ten times as much nicotine as other e-cigarettes. The blend was intended to eliminate the need for smokers to go back to cigarettes after an unsatisfying experience with vaping.

26.     Each JUUL pod is a plastic enclosure containing 0.7 milliliters of Juul's patented nicotine liquid and a coil heater. When a sensor in the JUUL device detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL device activates the heating element, which converts the nicotine solution in the JUUL pod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of a rainbow of colors when the device is waved around. The device looks similar to a USB flash drive.

27.     The physical design of the JUUL device (including its circuit board) and JUUL pod determines the amount of aerosolized nicotine the JUUL device emits. By altering the temperature, maximum puff duration, or airflow, among other things, Juul can finely tune the amount of nicotine vapor the JUUL device delivers.

28.     Juul's product quickly gained traction among consumers, rapidly surpassing Altria and securing the largest share of the closed-system e-cigarette market.

29.     Since its launch in 2015, Juul has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700% in 2017. According to a recent Wells Fargo report, Juul controlled 75% of the U.S. market for e-cigarettes by the end of 2018.

30.     In July 2017, Juul Labs was spun out of Pax as an independent company.

**C. Defendants' Participation in an Anticompetitive Conspiracy**

31.     Altria recognized that it could not effectively compete against Juul.

32.     Altria began a strategy of attempting to acquire Juul while simultaneously competing aggressively against it. Initially, Juul sought to compete with respect to its e-cigarettes, particularly with respect to price.

33.     In the summer of 2018, Juul sought to reach illegal and anticompetitive agreements to divide and allocate the market for e-cigarettes and not to compete.

34.     On July 30, 2018, Nick Pritzker, a Juul Board member, emailed Howard Willard, the CEO of Altria, an open term sheet for discussions. The term sheet demanded that Altria withdraw from the closed-system e-cigarette market entirely as a precondition to negotiations.

35.     On August 1, 2018, the negotiators met in Washington, DC to discuss various business terms, including anticompetitive agreements not to compete. The attendees consisted of lead negotiators for each side: Nick Pritzker and Riaz Valani (two members of Juul's Board); Kevin Burns (Juul's CEO); Howard Willard (Altria's CEO); and Billy Gifford (Altria's CFO). No attorneys were present from either side.

36.     After the August 1, 2018 meeting, Altria's top executives understood that ceasing to compete in the e-cigarette business would be a condition for reaching a deal with Juul. Altria tried to modify the non-compete term, but Juul refused to negotiate, which ultimately stalled negotiations.

37.    On August 9, 2018, Altria CFO Billy Gifford sent over a markup of the term sheet to Juul's negotiators, Nick Pritzker, Riaz Valani, and Kevin Burns.

38.    On August 15, 2018, Riaz Valani met with Dinny Devitre, another Altria Board member, at Mr. Devitre's New York office. These talks were ultimately unsuccessful and negotiations between Juul and Altria were temporarily suspended. While suspended, Altria's executives concluded that they had to meet Juul's demands if they were to successfully reengage Juul and restart negotiations.

39.    On October 5, 2018, Altria CEO Howard Willard sent a letter to Juul's representatives Nick Pritzker, Riaz Valani, and Kevin Burns, expressing its willingness to agree to the non-compete terms and that Altria was prepared to agree to exit the market. Kevin Burns forwarded Altria's letter to Juul's Chief Legal Officer. Soon after, Altria began to take key steps that would facilitate a possible wind down of the Nu Mark business and exit from competition in the e-cigarette market.

40.    Altria's concessions kicked-off the previously stalled negotiations. Soon after, Altria began to take the necessary steps to facilitate a possible wind down of its closed-system e-cigarette business.

41.    On October 25, 2018, Altria announced that it was temporarily halting its MarkTen Elite business, ostensibly out of concern that pod-based systems and nontraditional flavors could be contributing to youth usage. Pursuant to its agreement with Juul, Altria began to remove its e-cigarettes from the market.

42.    On December 7, 2018, Altria announced its decision to wind down its remaining e-cigarette business, including its MarkTen cig-a-like.

43.    On December 20, 2018, Altria announced its decision to discontinue e-cigarette operations. Juul and Altria then executed a series of agreements, including a Purchase

Agreement, which provided that Altria pay $12.8 billion in cash in exchange for newly issued Juul stock amounting to a 35% ownership interest in Juul. The agreement was not submitted to the Department of Justice or the Federal Trade Commission on the grounds that the Hart-Scott-Rodino Act did not require notification. The agreement valued Juul at roughly $38 billion, more than double Juul's reported value less than seven months earlier, demonstrating Juul's competitive success.

44.    By its terms, the Purchase Agreement incorporates various ancillary agreements, including:

  a.  <u>Relationship Agreement</u>, which provided, among other things, that Altria and Juul would not compete with one another. In entering into the non-compete, Altria agreed to withdraw from the e-cigarette market, allocating it exclusively to Juul. This non-compete went into effect in early 2019.

  b.  <u>Services Agreement</u>, which provided, among other things, that Altria would provide certain services to Juul, such as leasing convenience store shelf space. Altria also agreed to provide certain regulatory consulting, distribution support, and direct marketing and sales services. This had an initial six-year term. If it were to expire, the non-compete could be discontinued and Altria could again compete in the market against Juul.

  c.  <u>Voting Agreement</u>, which provided, among other things, that Altria would obtain three seats on Juul's Board of Directors following conversion of its shares.

  d.  <u>Intellectual Property License Agreement</u>, whereby Altria granted Juul a non-exclusive irrevocable license to Altria's e-cigarette intellectual property.

CLASS ACTION COMPLAINT

45.     On January 30, 2020, Juul and Altria announced the following amendments to their agreements:

     a.   <u>Revised Voting Agreement</u>, which provided that Altria would obtain two seats on Juul's Board of Directors, nominate one (of three) Juul independent directors, appoint one (of four) members of a Nominating Committee, appoint two (of five) members and the chair of a new Litigation Oversight Committee, and appoint one (of three) members of a Litigation Subcommittee. This also granted Juul's CEO a seat on the board, the Litigation Oversight Committee, and the Litigation Subcommittee.

     b.   <u>Amended Relationship Agreement</u>, which gave Altria the option to be released from the Non-Compete if Juul were prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.

     c.   <u>Amended Services Agreement</u>, which eliminated all services except for regulator support services.

46.     The agreements' anticompetitive effects were particularly clear in the market for closed-system e-cigarettes given high barriers to entry, such as U.S. Food & Drug Administration ("FDA") approval. Repositioning new products in the market was also unavailing to counter the anticompetitive impact of the agreement. Defendants cannot show the agreement restricting competition resulted in cognizable efficiencies sufficient to outweigh the competitive harm caused by Altria's agreement to exit the relevant market. Nor can Defendants point to pro-competitive benefits that could not have been achieved through less restrictive means. In fact,

much of the Defendants' collaboration was restructured in January 2020 to eliminate its marketing aspects, further reducing the scope of theoretical benefits from their agreements.

**D. Anticompetitive Effects**

47.    Altria and Juul were head-to-head competitors in the closed-system e-cigarette market during the relevant time period, with Juul maintaining approximately 75% market share in 2018.

48.    Altria and Juul agreed to a series of agreements in which Altria agreed to cease competition in the e-cigarette market and Altria invested $12.8 billion in return for Juul's issuance of stock to Altria amounting to a 35% ownership stake in the company.

49.    Defendants' anticompetitive transaction eliminated routes to other potential acquisitions or partnerships through which Altria might have participated in the relevant market.

50.    Juul's conduct in executing the deal with Altria unreasonably restrained competition in the U.S. market for closed-system e-cigarettes, including: (1) eliminating competition in the market between Juul and Altria, thereby eliminating price competition; (2) eliminating current and future innovation between Juul and Altria; and (3) eliminating competition between Juul and Altria for shelf space at retailers throughout the United States.

51.    Altria's agreement to leave the relevant e-cigarette market eliminated one of Juul's main competitors. As one the nation's largest tobacco companies with longstanding business relationships with national retailers, Altria otherwise had the resources and infrastructure to drive sales and compete aggressively.

52.    Before the shut-down of Altria's closed-system e-cigarette business, Juul and Altria relied on price promotions to boost sales of their e-cigarettes. Each checked up on one another's pricing in formulating its own pricing model. Altria's decision to withdraw MarkTen brought competition to an end.

53. Juul and Altria also competed through various product innovations, including device features and e-liquid formulations. Juul pioneered various pod-based e-cigarettes which prompted Altria to commit significant resources toward developing e-liquid formulations with nicotine salts and higher nicotine concentrations.

54. Altria leveraged its ownership of its flagship tobacco brands and categories in order to secure favorable shelf space at domestic retailers.

55. In 2018, Altria launched a major campaign to secure shelf space for its tobacco products, including e-cigarettes and related products, offering discounts, slotting fees, and fixture payments to retailers.

56. After the Juul-Altria transaction, instead of competing and jockeying for shelf space, Altria leased its shelf space to Juul. This effectively replaced its own MarkTen products.

57. Federal Trade Commission documents from Defendants make apparent that before committing to the transaction, Altria intended to remain in the relevant market long-term.

58. Altria's documents produced to the FTC and its executive statements evidence their acknowledgement that e-cigarettes were the thriving new future of the tobacco industry and committed to participating in that trend.

59. For example, Altria's former CEO Martin Barrington, stated to investors in February 2018: "So we'll be clear: We aspire to be the U.S. leader in authorized, noncombustible, reduced-risk products."

60. Additionally, Altria's current CEO Howard Willard told the Wall Street Journal in March 2019: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."

Altria circumvented competing in the e-cigarette market by anticompetitively investing in its upstart competitor. Altria abandoned competition in exchange for a significant share of Juul's profits resulting from a significantly less competitive marketplace.

**E. The Federal Trade Commission Action**

61.     On April 1, 2020, the Federal Trade Commission ("FTC") filed a complaint against Altria and Juul under Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), alleging the agreements violated Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

62.     The FTC alleged that the Defendants' conduct unreasonably restrained trade and competition in the United States, and that the agreements between Altria and Juul substantially lessened competition in the U.S. market for closed-system e-cigarettes by eliminating competition between Altria and Juul on price, innovation, promotional activity, and shelf space.

63.     The FTC sought several forms of relief, including: (i) restoring incentives to compete in the relevant market, including Altria divesting its equity stake in Juul, rescission of Altria's purchase in Juul, and other appropriate relief; (ii) voiding all agreements related to the agreement, as well as prohibiting future non-compete agreements amongst Defendants; (iii) prohibiting transactions between Altria and Juul that combine their business in the market for closed-system e-cigarettes, unless prior approval is granted by the Commission; (iv) prohibiting officers or directors on either board from serving on the other Defendants' respective board of directors and from attending its meetings; and (v) certain compliance monitoring and prior notice to the Commission.

**F. Relevant Market**

64.     The relevant product market for the purposes of this action is the closed-system e-cigarette market.

65.     E-cigarettes are electronic devices that deliver nicotine to a user by vaporizing a liquid nicotine solution. There are two categories of e-cigarettes: closed-system and open-tank. In a closed system, the liquid is contained in a pre-filled, sealed cartridge or pod along with a heating mechanism. Juul and MarkTen Elite are both closed-system e-cigarettes. Open-tank e-cigarettes are more customizable as they contain refillable tanks that customers manually fill with an e-liquid of their choice. Customers may experiment with different flavors and nicotine strengths in open-tank e-cigarettes.

66.     Closed-system and open-tank e-cigarettes are sold in different channels. The majority of closed-system e-cigarettes are sold through the multi-outlet channel, which consists primarily of convenience stores and gas stations. Convenience stores and gas stations offer a limited range of e-cigarette products. In contrast, open-tank e-cigarettes are sold almost exclusively at vape shops, retail outlets that typically carry an extensive selection of e-liquids and parts for open-tank products and offer a high level of customer service. Vape shops are less accessible to an everyday consumer.

67.     Defendants considered their respective Juul and MarkTen product lines to be direct competitors with each other and with other closed-system e-cigarette products and set prices based on competition with each other and with other closed-system products. Defendants further acknowledged that their closed-system e-cigarette products did not compete as closely with open-tank products.

68.     There are no reasonable substitutes or alternatives for closed-system e-cigarettes. Closed-system e-cigarettes appeal to consumers because they are discreet due to their small size, and convenient due to their self-contained, ready-to-use format. They are also low-maintenance

and cost-conscientious. Open-tank e-cigarettes are not an adequate substitute for closed-system e-cigarettes because they are larger, more complex, and require more manual operation by the user. Open-tank e-cigarettes generally appeal to a different customer type.

69.    The relevant geographic market is no broader than the United States. Because of FDA's requirements, foreign firms cannot import e-cigarettes into the United States without prior FDA approval.

70.    According to Nielson data, retail sales of closed-system e-cigarettes in the United States in 2018 constituted approximately $2.8 billion.

**G. Monopoly Power**

71.    Throughout the Class Period, Juul dominated the relevant market and maintained power to control prices and exclude competition in that market.

72.    According to a Wells Fargo report on the tobacco industry based on Nielson scanner data, Juul had amassed a 72 percent market share by August of 2018. Altria's  market share at that time was 8 percent.

73.    Altria began pulling its products off the market in October 2018. By November 2018, Altria's market share had fallen to 4 percent, and Juul's had grown to over 75 percent.

74.    By December 2018, Altria had pulled its products off of the market entirely.

75.    Defendants' agreements not only eliminated one of Juul's most successful competitors, but it also gave Juul access to Altria's vast resources and capital.

76.    The agreement was intended to, and did, significantly increase Juul's monopoly power in the relevant market.

**H. No Procompetitive Benefits**

77.     Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the conduct alleged substantially lessened competition in the relevant market.

78.     Defendants cannot demonstrate pro-competitive benefits of the conduct alleged that could not have been achieved through alternative means that would have been less restrictive on competition than the conduct alleged.

79.     Defendants cannot demonstrate that entry into the relevant market by new competitors or expansion by existing competitors would be timely, likely, or sufficient to offset the anticompetitive effects of the conduct alleged.

80.     The entry of new competitors into the relevant market is unlikely because the regulatory approval process is exceptionally time-consuming and expensive. Defendants themselves estimate that preparing a Premarket Tobacco Product Application ("PMTA") for an e-cigarette would require substantial time and investment.

81.     In addition to achieving regulatory approval, a new entrant would need to: (i) develop or acquire a product; (ii) manufacture the product at quality and scale; (iii) sell the product; (iv) develop a distribution system; and (v) develop a marketing plan, including a plan to secure shelf space in retail outlets.

82.     Existing closed-system e-cigarette competitors cannot effectively replace the lost competition because: (i) they lack Altria's brand strength to secure favorable shelf space at retailers; (ii) they lack the substantial resources Altria had at its disposal to commit to e-cigarette research and development as well as to pursuing regulatory approval; and/or (iii) the FDA's enforcement of restrictions on e-liquid flavors has negatively impacted the competitive presence of closed-system competitors other than Juul, who had voluntarily discontinued its flavors earlier.

83.     Open-tank e-cigarette manufacturers are not likely to replace the lost competition, in part because the impending PMTA deadline will likely cause many of them to shut down, and because they are largely sold in the separate "vape shop" sales channel and would not likely be able to expand rapidly into convenience stores, where closed-system e-cigarettes are typically sold.

84.     Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the transaction substantially lessened competition in the relevant market. Defendants cannot demonstrate pro-competitive benefits of the conduct alleged that could not have been achieved through alternative, less restrictive means.

85.     Defendants' unlawful conduct eliminated competition in the relevant market and deprived Plaintiff and the Class of the benefits of free and unrestrained competition that the antitrust laws were designed to ensure.

## CLASS ALLEGATIONS

86.     Plaintiff brings the claims asserted in this action on behalf of himself and as class claims under Federal Rules of Civil Procedure 23(a) and (b)(2) seeking damages and injunctive relief on behalf of a similarly situated class, which is defined, as follows:

> All persons and entities in the United States that directly purchased e-cigarette products from Juul during the Class Period.

87.     This definition specifically excludes the following person or entities:

a.   Any of the Defendants named herein;

b.   Any of the Defendants' co-conspirators;

c.   Any of Defendants' parent companies, subsidiaries, and affiliates;

d.   Any of Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents;

  e. All federal governmental entities and instrumentalities of the federal

    government;

  f. All states and their subdivisions, agencies, and instrumentalities; and

  g. The judges and chambers staff in this case, as well as any members of their

    immediate families.

  88. Plaintiff does not know the exact number of Class members, because such information is in the exclusive control of Defendants. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

  89. Common questions of law and fact exist to members of the entire Class. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all members of the Class. Such questions of law and fact common to the Class include, but are not limited to:

  a. Whether Defendants combined or conspired with one another to fix, raise,

    maintain, or stabilize prices for e-cigarette products sold in the United States

    at any time during the Class Period;

  b. Whether Defendants combined or conspired with one another to divide or

    allocate the market for e-cigarette products sold in the United States at any

    time during the Class Period;

  c. The duration of the alleged conspiracy and the acts carried out by Defendants

    in furtherance of the conspiracy;

  d. Whether Defendants had market power with respect to the relevant market;

  e. The definition of the relevant market;

f.   Whether Defendants' alleged conduct violated the Sherman and Clayton Acts;

g.   Whether Defendants' conduct caused the prices of e-cigarette products sold at any time during the Class Period to purchasers in the United States to be artificially fixed, raised, maintained, or stabilized at supracompetitive prices or price levels;

h.   Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages; and

i.   Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive and declaratory relief, and, if so, the nature and extent of such relief.

90.   These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

91.   Plaintiff's claims are typical of the claims of the members of the Class and Plaintiff will fairly and adequately protect the interests of the class. Plaintiff and class members are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for e-cigarette products purchased directly from the Defendants and/or their co-conspirators.

92.   Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class that Plaintiff seeks to represent.  Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

93.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

94.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

95.    Class action treatment is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

96.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## CLAIMS FOR RELIEF

### COUNT I – Restraint of Trade in Violation of Section 1 of the Sherman Act
### (15 U.S.C. § 1)

97.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

98.    Defendants entered into and engaged in continuing contract, combination, conspiracy, or agreement to artificially fix, raise, maintain, and/or stabilize the prices of e-cigarette products sold to purchasers within the United States, its territories, and the District of Columbia. This resulted in an unreasonable and unlawful restraint of trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1.

99.    Defendants' anticompetitive acts were intentionally directed at the United States market for e-cigarettes and had a substantial and foreseeable effect on interstate commerce by raising and fixing e-cigarette prices throughout the United States.

100.    The aforesaid violations of Section 1 consisted of a series of agreements designed to unlawfully concentrate Juul's market power for close-system e-cigarette products, whereby Altria withdrew from the relevant market in exchange for an interest in Juul's continuing business in the relevant market from which Altria withdrew. The purpose of these agreements was to fix, raise, maintain, or stabilize prices of closed system e-cigarette products in the relevant market as well as stifle innovation.

101.    Altria agreed to exit the closed-system e-cigarette market, provide intellectual property, marketing, distribution, and access to convenience store shelf space across the United States in order to increase Juul's market share. In exchange, Altria received a 35% interest in Juul.

102.    The contract, combination, conspiracy, or agreement had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

    a.   Prices charged to, and paid by, Plaintiff and Class members were artificially raised, fixed, maintained, or stabilized at supracompetitive levels;

    b.   Plaintiff and Class members have been deprived of the benefits of free, open, and unrestricted competition in e-cigarette products in the United States; and

    c.   Competition in establishing prices paid for e-cigarette products has been unlawfully restrained, suppressed, or eliminated

103.    As a result of Defendants' unlawful conduct and acts taken in furtherance of their conspiracy, Altria removed competing products from the relevant market, thereby eliminating current and future price competition between Juul and Altria, in particular promotional activity to create awareness and drive sales. Further, the unlawful conduct had the purpose and effect of eliminating current and future innovation competition between Juul and Altria; and eliminating

current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

104.    To formulate and effectuate their conspiracy, Defendants participated in meetings and conversations to eliminate competition from the market and agreed to allocate or divide the market for e-cigarette products between them.

105.    Defendants' anticompetitive activities have directly, proximately, and materially caused injury to Plaintiff and Class members in the United States.

106.    Defendants' anticompetitive and unlawful conduct is per se illegal.

107.    As a direct, foreseeable, and proximate result of Defendants' anticompetitive conduct, Plaintiff and the Class members were injured in their property and are threatened with further injury. Accordingly, Plaintiff and the Class members seek declaratory and injunctive relief.

**COUNT II – Restraint of Trade in Violation of Section 7 of the Clayton Act**
**(15 U.S.C. § 18)**

108.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

109.    The agreements, as described above, whereby Altria received a substantial ownership stake in Juul and for the purposes of which Altria withdrew its existing e-cigarettes from the market and halted its innovation on future products, substantially lessened competition in the U.S. market for closed system e-cigarettes.

110.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury to their business and property.

111.    Accordingly, Plaintiff and the Class seek treble damages under Section 7 of the Clayton Act, 15 U.S.C. § 18.

**COUNT III – Declaratory and Injunctive Relief for Violations of
Section 1 of the Sherman Act and Section 7 of the Clayton Act
(15 U.S.C. § 26)**

112.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

113.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

114.    Plaintiff's allegations described herein constitute violations of Section 1 of the Sherman Act.

115.    Defendants effectuated a scheme to restrain trade, lessen competition, and monopolize the market United States market for closed-system e-cigarettes.

116.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect.

117.    As a direct and proximate result of Defendants' anticompetitive scheme, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

118.    The goal, purpose and/or effect of the scheme was to prevent and/or delay competition to continue charging supra-competitive prices for e-cigarette products without a substantial loss of sales.

119.    The anticompetitive agreements alleged herein should be declared invalid and unenforceable.

120.    As a result of Defendants' antitrust violations, Plaintiff and the Class have suffered injury to their business or property. Their injury consists of paying higher prices for e-cigarette products than they would have paid in the absence of those violations. These injuries will continue unless halted.

121.    Accordingly, Plaintiff and the Class seek a declaratory judgment that Defendants' conduct constitutes a violation of § 1 of the Sherman Act pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a).

122.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, requests that the Court enter judgment by adjudging and decreeing that:

A.   This action may proceed as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

B.   Defendants have combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 7 of the Clayton Act, and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

C.   Plaintiff and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15 and Section 7 of the Clayton Act, 15 U.S.C. § 18;

D.   Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

1.   A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants; and

2.  Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements alleged herein; and

3.  Divestiture of Altria's equity stake in Juul and rescission of Altria's purchase of that stake.

E.  Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

F.  Plaintiff and the Class members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

G.  Plaintiff and the Class members recover their costs of suit, including reasonable attorneys' fees as provided by law; and

H.  Plaintiff and the Class members receive such other and further relief as the case may require and the Court may deem just and proper.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated: June 25, 2020                      Respectfully submitted,


                                          */s/ Dennis Stewart*
                                          Dennis Stewart
                                          **GUSTAFSON GLUEK PLLC**
                                          600 B Street
                                          17th Floor

26

San Diego, CA 92101
Telephone: (619) 595-3299
dstewart@gustafsongluek.com

Daniel E. Gustafson
Daniel C. Hedlund
Amanda M. Williams
Daniel J. Nordin
Ling S. Wang
Mary M. Nikolai
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
awilliams@gustafsongluek.com
dnordin@gustafsongluek.com
lwang@gustafsongluek.com
mnikolai@gustafsongluek.com

David Cates
**CATES MAHONEY, LLC**
216 West Pointe Drive, Suite A
Swansea, IL  62226
Telephone: (618) 277-3644
Facsimile: (618) 277-7882
Email: dcates@cateslaw.com

*Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT